Sandoz, Inc. v. Sandoz, Inc. v. Sandoz, Inc. v. Sandoz, Inc. v. Sandoz, Inc. Sandoz, Inc. v. Sandoz, Inc. May it please the Court, Deanne Maynard for Appellant Sandoz. I'm going to be presenting arguments for all of the defendants on the arguments in our brief and then Mr. Roth is going to address the arguments in his separate brief for three minutes and then I would like to reserve three minutes for rebuttal. Mr. Riccosi is also here if you have questions about Lupin's other arguments. The patents here claim nothing new. They simply recite a narrow range of the same combination for the same use as in Allergan's own now expired prior art patents. But isn't it new to have the lower dose of the Imataprost and the higher dose of GAK? No, Your Honor. Both of those ranges were already disclosed in their three prior art patents, which they indeed asserted against this new product in the Orange Book. So they claim at the same time that their prior art patents cover this very product, yet somehow they're entitled to new patent coverage having already enjoyed their entire patent coverage for this very product. But weren't they disclosed only as part of a genus and not specifically in combination? No, Your Honor. The prior art patents disclosed both a range of Imataprost and covered Bromatoprost in the precise concentrations covered here, which is preferably about 0.01 to about 1 percent. In other words, a less than 1 percent range. And then also the preservative back was one of five preferred preservatives listed in their prior art patents in a range from 0 to 1,000 parts per million. So, in fact, it's the same chemical composition here, Judge Lurie. It's just a different range. It's not a genus species in that sense. It's exactly the same species. It's just a different range. They've already claimed and obtained patent coverage for this very product. So, the patent is a particular combination, a particular concentration, a combination of the particular concentrations. And that particular combination was disclosed in the prior art patent. And that creates a potent case of obviousness. Can you point out exactly where in the prior art that is? Yes. In the 819 patent, I am in volume three of the joint... I have the 819 patent. I'm in column eight. And it says I'm in around line four. The therapeutically efficient amount typically is between about 0.0... Specifically, right? It does not disclose 0.01 by name, but it does by range, Judge Lurie. So, preferably about... In other words, that's the genus. I think that even if one looks at it and calls it a genus and a species, the species is within this genus. It is disclosed. But I don't think the sort of genus species analogy, like in a lead compound case, is the right way to look at this, because this is the same chemical structure that they're claiming now. In fact, they claim that these patents cover the product that we're trying to market now. And how about the BAK at the 200 level, PPM level? Yes, Your Honor. So, slightly further down that page, column eight still, line 15. Sorry, it's a tongue twister. Preferred preservatives that may be used in the pharmaceutical compositions of the present invention include, but are not limited to, benzalkonium chloride. That's BAK. That's the first one listed. It's the most commonly used preservative in eyedrop products. Once again, that's a broad range, so... The range, Your Honor, is from zero to... A thousand. A thousand parts per million. But that's the same range that was present in this court's decision in Allergan v. Sandoz, the same exact range of the same exact preservatives, BAK. And this court found the composition patent there obvious over that prior disclosure. And it's not... But doesn't this specific combination that we're talking about here, this so-called species,  No, Your... The efficacy is pretty close to the 0.03% beta-prose, at the same time with less hyperemia. And the BAK functions to improve corneal penetration. Okay. All of that led to be a surprise, an unexpected result. It's not an unexpected result that's probative of non-obviousness for this reason. The fact that it's almost as effective as 0.03% is just simply a difference in degree. It would have been expected to be less effective. And it's simply not quite as effective. And all the district court found was that it was just not quite as effective. And it was more not quite as effective as one would have thought. And that's a classic difference in degree, which this court has said, and indeed the Supreme Court... Isn't the district court also based that finding on the fact that the 200 level of the BAK had greater penetrability, and that that was unexpected because that wasn't shown in the prior art? Well, two points about that, Judge Hughes. One, that property is not claimed in these claims, that the penetration would be enhanced. And therefore, we don't have to show that that wasn't unexpected, nor should it be probative of non-obviousness for these claims that don't claim that. The relevant... Property doesn't have to be claimed to be relevant to unexpectedness. Well, Your Honor... And in fact, higher dose of BAK was thought to be disadvantageous. The compound was looked at as almost being toxic. Well, let me quarrel with your premise to start with. I mean, I think that in the Allergan v. Sandoz case, where the court struck the combination claim, but upheld the clinical result claim, if it were true that an unclaimed, unexpected result could save a claim, then one would have thought the two would have come out the same there, but they did not. But even accepting Your Honor's... That's always been true for decades. An unclaimed, unexpected result is relevant to obviousness. Even if it's unexpected in fact, it's not relevant to obviousness unless it's probative of non-obviousness. And a difference in degree is not probative of non-obviousness, and that's been true since the Supreme Court decision in Smith in 1837. So it has to be a difference in kind. All they've shown here is that this combination is not quite as ineffective as one would have thought it would be, and that is just a classic difference in degree. The fact that the back might be the cause of that is nothing but stating the result of an obvious combination, and that's not enough to get you patentability. In fact, when one looks at the figures in these patents, figures one and two show that the back enhanced the penetration in their 50 parts per million product as well. That was disclosed in the prior art. So the closest prior art, again, is their prior art patent that they claim covered this very product, and it had back in it as well, and the figures in these patents show that it increased the penetration. So there's nothing here but a classic change in degree. It's not enough to get the new patent coverage on essentially the exact same compound. On these points about the teaching away and unexpected results that the district court found against you for, I mean, it seems like those are factual findings. Are you saying that those are clear error? I know you're trying to frame it as a legal issue, but it seems to me that they really are the notion of whether something taught away, or at least the more troubling one to me is the unexpected results, that that's a really very specific factual finding, and that it seems like there's testimony from an expert on the other side to support that. Your argument sounds perfectly reasonable to me that the 50 percent showed greater penetrability, but I'm not here to re-weigh the facts. So if those are clear error standards, then it seems hard that you have a hard battle to overcome. In Galderma, this court recognized that the result was unexpected in the sense of unexpected as a fact, but not legally probative of non-obviousness, and so it is a legal question. Although Galderma also found several factual findings clearly erroneous, too, to get to its results. So are you asking us to do that, find these factual findings clearly erroneous like we did in Galderma, or is there some way that we can just say those factual findings are not, you seem to be saying that they're not probative of non-obviousness, but I don't really quite understand that. They're not probative of non-obviousness, Judge Hughes, because a difference in degree is not probative of non-obviousness. That's a question of law. This court has held that for decades, that it has to be something more than a simple small improvement within a choice and a range, and you're essentially almost talking about optimizing the prior art range and getting something slightly better, and in fact, if not better, it's just not as bad as they thought it would be. And that is just a classic difference in degree that shouldn't entitle them to a new invention. But it's better in the sense that it produces less hyperemia. But that's totally unexpected. The district court found that at AA80, that reducing the, oh, I may have given you the wrong page number, but the district court specifically found, and Allergan conceded, that there was a motivation to reduce the amount of bimodipros, and the district court expressly found that bimodipros increases hyperemia, and so there would be an incentive to reduce that. So that's completely unexpected. That's totally expected, and they don't challenge that. If I could, I don't want to run out of my rebuttal time, but if the court had questions on written description, because I think there's not adequate written description on the clinical results claims, the... You've got 50 seconds to talk about Example 5. Example 5, thank you, Judge Lurie. Example 5 doesn't report anything about the formulation that they're claiming here. It has a different... It certainly has come down from .03, close to .01, and the B.A.K. has gone up from .50 to not quite .200, but it's certainly gone up in that direction. That's true, Your Honor, but those combinations were in the prior art. That's nothing but repeating prior art patents. It doesn't tell you anything about the precise formulation here. If I may save my 10 seconds for rebuttal. We will do that. Ms. Brooks. Mr... Oh, Mr... Okay, Mr. Roth is going to speak for three minutes. Didn't mean to slide you, Mr. Roth. It's okay, no offense taken. May it please the court, I'm here for Appellant Hitech. You're going to talk about P.H. P.H., I hadn't written a description quickly. I'll try to get to both quickly in my three minutes. I just want to address one thing. Dan was correct, it was page 880 in paragraph 70. And you look at the sentence there, and by Allergan's own admission, there was a motivation to select a lower concentration of the metaprost because it was known in the prior art that the metaprost causes hyperemia. So they admitted it's not... Lowering the metaprost to reduce hyperemia was not... was expected. On to... But it wasn't expected that if you lower the dose, you could get something that's still as effective or almost as effective. Right, and that's where the... And that's where the combination with the BAK... The percentage increase comes in. That merely showing a lower... a bigger percentage of the benefit is not an unexpected result. Also, the point was made about 200 BAK being toxic. If you know that, latanoprost, which is in the same class of compounds as benataprost, both prostaglandins, uses 200 BAK. Now, Allergan has made this argument about... about latanoprost being different because somehow it complexes. But I think they're being... That's not quite correct. I mean, if you look at what they argued to FDA to get approval of Lumigan .01, they argued that 200 BAK was safe. And what did they cite in support of that? Latanoprost. But now, when it comes to keeping generics off the market, no, no, you can't rely on latanoprost. It's a different product. So... And there are other products that are... five other products that use 200 BAK. And yes, all products have toxicity. Botox, Allergan's best-selling product, has... is one of the... It's made from botulinum, one of the most toxic substances on Earth, known to man. So, yes, it's... There's... All drugs have toxicities, and they have benefits, and they have to be weighed against each other. And that's why BAK is prevalent. I really wanted to talk about 112 and pH, but I'm running out of time. On 112, we have an argument based on... on written description on the 118 and 353 patents, and those patents claim a clinical benefit that the 0.01% bimatoprost 200 ppm BAK formulation has lower hyperemia and at least as much IOP lowering as the 0.03% formulation of the prior art. The patent spec says nothing about that. That clinical comparison  Allergan argues that the 0.03% BAK formulation and the 0.01% formulation is a best-mode formulation. But there are many best-mode formulations, dozens in the spec, and there's no statement in the spec that the best-mode formulations satisfy this claimed clinical comparison. What about example 5? Example 5 relates to a formulation J. Formulation J has 0.015% bimatoprost and 125 ppm BAK. 50% more bimatoprost, 60% less BAK. Now, that's a very different formulation. I mean, Allergan argues that, citing to some deposition testimony that may or may not be in evidence properly, that the clinical feature is obvious from the spec or predictable from the spec. But this court has held, in an opinion you authored, Ariad versus Eli Lilly, that a patent spec that merely renders a claim obvious does not satisfy the written description. I'm out of time. Thank you. All right. Thank you, Mr. Ross. Ms. Brooks. Thank you, Your Honor. May it please the Court. What has been studiously ignored and failed to be addressed by appellants is this. What Galderma simply said is if there's a range that's been disclosed in the prior art, then one must look to see is there a motivation to pick a particular number within that range? Or, if one looks at the prior art, does it teach away from the claimed invention? Or are there new and unexpected results? Or are there other pertinent secondary considerations? This is right from Galderma. So let's answer that question. What was the motivation to pick from the range a 200 part per million BAK when the prior art was at 50 parts per million? We would submit that there was no CISH motivation and, in fact, it was a Peloton expert, Dr. Samples, who testified as follows about BAK. This is the teachings in the prior art about BAK. It is a natural-born killer. It is from Satan. It will increase your interocular pressure, the very thing you're trying to decrease with this medication. It will increase hyperemia, the very problem that the inventors were trying to solve with this reformulation. It will peel the corners of your corneal cells. So this isn't a side effect we're talking about here. We're talking about true toxicity. So if we take that and we put it into Galderma, if, in that case, the Adapalene, by increasing it, wasn't simply going to make a little more irritation. It was going to make your acne worse and it was going to give you eczema. Then, would that invention have been obvious in Galderma? I would submit no, it wouldn't have. And that's what we have here. An exceedingly toxic drug that all the prior artists teaching get away from use as little as possible. Now, Appellant, the last counsel that was here, said to the court, well, but there were two, Zalatan and Travitan. They were on the market at higher BAKs. As he conceded, in the record, the evidence was that they hadn't used that much BAK because the BAK was complexing with the latanoprost in the case of Zalatan and with the traviprost in the case of Travitan. And therefore, the preservative part of the BAK was a very small amount. So they had to put that much in. But even having done that, they then immediately began efforts to try to get rid of it. In Travitan, the evidence is that they got rid of it all together with Travitan C. They got eliminated the BAK. In Zalatan, the Asada patent that was discussed at trial in A8178 details the effort of the Zalatan inventors to reduce the BAK. So everything points in the direction of do not pick a higher amount of BAK. Pick a significantly lower amount. And this appellants studiously avoid because they have no choice. I mean, those factual findings are certainly in your favor. But what really troubles me about this is that it seems like if the district court had made factual findings on the other side there's probably evidence to support them and that we would then be identical to Galderma. And it seems very troubling to me that we have a case that seems on all fours with this one and it's coming out a different way because of different factual findings that really don't seem all that different. Well, I would respectfully disagree, Your Honor, in that the difference is this. In Galderma we were talking about one point. We have to look at the invention as a whole here. We're not just talking about lowering the active from .03 to .01. We're talking about raising the preservatives from 50 parts per million to 200 parts per million. Galderma was simply talking about changing the amount of the active ingredient and actually raising it so that it would be more effective. And what Galderma was saying is – I don't read Galderma as confining itself to just obviousness within one range, though. I mean, you have two ranges here, but they're both disclosed in your prior patent. And they both use the same kind of ingredients, and they're just now different in degree and different in effect, which seems to me precisely what Galderma said is obvious. I would assume they're not a difference in degree. They are a significant difference in kind. And that's the difference with Galderma. Yes, it could apply to multiple ranges, but then you have to do the Galderma analysis for each of those ranges. So the question is, as far as picking 200 ppm BAK, what does the prior art  was disclosed in the Woodward patent in 1997, but the inquiries in 2005, what would they have known in 2005? Let me ask you this. You want to dispute the prior art that disclosed the 200 BAK. Would you think that's clearly erroneous? Yes, it would have been, but he didn't. What he found was that the 200 ppm wasn't disclosed as a free BAK of 200 ppm. There was only a small amount of free BAK. And the court would have to find that every single one of those factual issues was clearly erroneous. And we have multiple ones. Had it come out different? I would be arguing out that your honors did ask about the unexpected results of .01 versus .03 being as effective. And those were indeed unexpected results. Because the label width reference where they compared .03 and .01 the testimony is that .01 was inferior to the tune of 2 mm of mercury difference in IOP. And Dr. Nowaker said every mm of mercury counts and that it could make the difference between having permanent damage to the optic nerve or not having permanent damage to the optic nerve. That again is a difference in kind not a difference in degree. Tell us why there's adequate written description of the superior results with the .01 200. We talked about example 5. Example 5 is not precisely on point. It is not precisely on point but it is very close. It is a prophetic example that says one would expect by reducing the from .03 to I believe in that one it was .15 that you would expect a reduction in hyperemia. So that's exactly what we were looking for here. It also teaches about raising the BAK from 50 to 125. The key that is not in prior art are figures 1 and 2. They show that BAK surprisingly acted as a penetration enhancer for the mematoprost. And so while appellants are saying that's not the claim, it is the claim. Are these claims that recite results original claims? Yes, Your Honor. We have two sets of claims. We have the formulation claims and then we have the claims that say it has to be .01 has to have the same or similar efficacy to the .03 and that is also And a claim is part of the specification? Correct, Your Honor. We also have that. The claim is part of the specification and we have something else here. One more thing. We have the actual formulation for .01. So if I am one of skill in the art on the written description the question is one of skill in the art looking at the patent could they see whether or not the inventors were truly in possession of the claimed invention. We look and see the actual formulation of .01 and we see figures one and two which taught for the first time opposite of the prior art. The prior art showed that an uncharged molecule would not have its penetration enhanced by BAK. Our inventors stumbled upon the surprising result that it increased penetration. That means we could lower it from .03 to .01 while maintaining efficacy. Why? Because we got the increased penetration and we only knew that because our inventors stumbled upon it and that's what's shown in figures one and two. You have to look at all the specifications. During the lifetime of your prior art patent that claimed these very broad ranges if a competitor had come on the market with this new formulation and gotten sued by you presumably because it was within the range of your prior art patent could they have argued to get out of the patent coverage that it actually wasn't covered by your prior art patent because the prior art taught away and this was unexpected results or would they have infringed your prior art patent with this new formulation? You know that's an interesting question your honor. I guess the answer is they presumably have. That's what we call a say something to give oneself a moment to think statement. Your honor what they could have argued I assume is that the claims were in the Woodward patent that the claims would be invalid then because they weren't supported by written patent. I think they could have now luckily I can say that because it's expired but I think they might have had an argument that that  supported but ours is supported because we have details in our specification that were not in the original 1996 Woodward patent. If your honor if you can give them a chance to respond if Ms. Maynard wishes to. Yes your honor so it's a very simple issue and again it's a factual finding. The question is that the claim reads about 7.3 high text formulation is 7.2 and the Dr. Nowaker testified that in his expert opinion is one of skill in the art 7.2 is about 7.3 the court accepted that as a factual finding that the court made and clearly the patent that discloses and claims about 7.3 also has 7.4 in it? That is what our expert testified. I mean you read it I think it includes 7.4 it states 7.4 as well as 7.3 I believe so your honor but the claim itself that we're talking about to get the exact wording I will look at the 504 is a composition having a pH of about 7.3 which consists essentially of and then it gives the .01 percent of the matter cost 200 parts per million BAK and the rest the phosphate buffer the water etc. and so the claim says about 7.3 the factual inquiry is is 7.2 about 7.3 the judge found that it was and was not clearly erroneous it's a rather straightforward infringement argument thank you Ms. Brooks thank you very much Ms. Maynard has three minutes to rebut I appreciate you restoring my time Judge Lurie if I could make quick points on Galderma Galderma builds on precedent from this court dating back to 1930s it doesn't mention genus and species it says that when something is within a prior art range and you attempt to claim it again there must be something beyond just that to come over and I I see where you're going with Galderma and it seems to me that if the district court had made different factual findings then it would be on all forms but it does say that when you're within ranges you know then it falls to the patentee to show unexpected results and teaching away or things like that and that's precisely what the district court found here and I have a hard time seeing how those findings even if I might disagree with them are clear error the district court found almost exactly the same kinds of things in Galderma Judge Hughes and the court held the patents obvious because it is not a teaching away just because a known composition is slightly inferior to another known composition for the same use and so the Galderma held the teaching away said to the extent we have to hold it clearly erroneous we hold those findings I think the same is true here there's nothing but but that here the back 200 parts so the teaching away I think you're close on but the unexpected result it seems to me that that finding is supported by the Galderma Court of Appeals let stand but said a difference in degree is not as a legal matter does not amount to evidence of non-obviousness and that is exactly the same thing that we have here and in response to your question to opposing counsel they asserted the 891 patent in this case I can't find all the complaints because they're not in the JA but A344 is the cover page to the original complaint against Watson and in the first paragraph it says this is an action for infringement of United States Patent 504 and the 819 patent they've been blocking people from using this current product during the whole life of their previous patent and the patent laws don't allow that that is the basis of the Galderma line of cases if I could make one more point about the written description example 5 is not close enough as my colleague pointed out it's significantly different 50% different than the amount of fact and Judge in 2012 this product the Lumigan .01 product was introduced to the market in 2010 so so so these claims that result that recite results were added during prosecution of those patents I am reporting information that's been told to me I understand that they were added in 2012 while the original application 2005 didn't have any clinical elements only had example 5    were first introduced to the spec or the claim so